UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                      Case No. 19-20115

v.                                        Hon. Denise Page Hood

ROMANE PORTER,

      Defendant.
_____/

**ORDER DENYING DEFENDANT'S EMERGENCY
MOTION FOR IMMEDIATE TRANSFER
TO HOME CONFINEMENT [ECF No. 67] and
DEFENDANT'S MOTION FOR EXPEDITED
TREATMENT OF HIS EMERGENCY MOTION [ECF No. 68]**

## I.    Introduction

On April 3, 2020, Defendant filed an Emergency Motion for Immediate Transfer to Home Confinement. ECF No. 67.[1] Defendant's motion is based on concerns about his health in light of the COVID-19 crisis. The Government filed an expedited response on April 8, 2020. The Court, having concluded that the decision process would not be significantly aided by oral argument, previously ordered that the motion be resolved on the motion and briefs submitted by the parties. E.D. Mich. L.R. 7.1(f)(2). ECF No. 69.

## II.    Background

---

[1] Concurrent with the Emergency Motion for Immediate Transfer to Home Confinement, Defendant filed a Motion for Expedited Treatment of the Emergency Motion. ECF No. 68. The Court, having decided the Emergency Motion, denies as moot the Motion for Expedited Treatment of the Emergency Motion.

Defendant is a disabled United States Navy veteran who was honorably discharged from the United States Navy due to severe bronchial asthma, sinusitis, various allergies, and chronic obstructive pulmonary disease ("COPD"), a chronic inflammatory lung disease that causes obstructed airflow from the lungs. Defendant currently is being held in federal custody in the Sanilac County Jail, in Sandusky, Michigan. On February 28, 2019, he was indicted for seven counts of sale or possession of stolen motor vehicles under 18 U.S.C. §§ 2313 & 2, and he consented to detention shortly thereafter. ECF No. 20. When Defendant filed the Motion, his jury trial was scheduled to begin on May 19, 2020. In light of Court closures and national and state guidelines and orders, however, his jury trial is scheduled to begin on July 21, 2020.

### III. Analysis

Defendant states that:

> The CDC, the U.S. Attorney, and Governor Gretchen Whitmer, among others, have further recognized the particular danger the COVID-19 pandemic poses to individuals held in correctional and detention facilities, particularly those individuals that suffer from underlying health conditions. From the CDC, "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." This heightened danger caused U.S. Attorney William Barr to direct those in charge of the Bureau of Prisons "to prioritize the use of [their] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." Similarly, Governor Gretchen Whitmer issued her March 29, 2020 Executive Order to "protect vulnerable Michiganders who work at or are incarcerated in prisons, county jails, local lockups, and juvenile detention centers across the state." As part of that order, anyone authorized to act under the County Jail Overcrowding Act, including sheriffs, and judges, was "strongly encouraged to consider early release" for all individuals who meet certain criteria, including those with

2

"chronic conditions". Even this Honorable Court issued an Administrative Order for the purpose of "reducing population density in [the Bureau of Prisons] and detention facilities".

Defendant Porter is one of the "vulnerable individuals" referred to by the various executive orders and guidance. Porter has been considered disabled since his honorable discharge from the United States Navy due to severe bronchial asthma, sinusitis, various allergies, and chronic obstructive pulmonary disease ("COPD"), a chronic inflammatory lung disease that causes obstructed airflow from the lungs. Asthma and COPD also put Mr. Porter at higher risk for complications from COVID-19. Indeed, Porter's conditions cause breathing to be difficult, chronic cough, wheezing, and shortness of breath – the same symptoms caused or exacerbated by COVID-19.

ECF No. 67, PgID 272-73 (footnotes omitted).

Defendant argues that:

[He] should be released from Sanilac County Jail ("SCJ") immediately and allowed to await his pending trial date in home confinement under conditions left to the discretion of the Court. SCJ is not a safe facility for [him] during the COVID-19 pandemic. The very nature of SCJ, and many confinement and detention centers like it, runs contrary to the consistent guidance from governmental and other officials tasked with preventing further spread of COVID-19.

A normal day at SCJ necessarily involves deviating from numerous CDC guidelines for handling COVID-19. *First*, inmates like [Defendant] are consistently exposed to "groups of more than 10 people" living and socializing in confined spaces and using community restrooms; there is no practical way to avoid other people. *Second*, despite the CDC's advice to "avoid eating or drinking at bars, restaurants, and food courts," residents at SCJ are required to eat in common areas alongside more than 10 other people. *Third*, while the CDC tells the American public to "work . . . FROM HOME whenever possible," daily staff ingress and egress at SCJ and the constant addition of new inmates provide many opportunities for COVID-19 to be introduced to and spread around SCJ. In sum, SCJ's inability to enforce precautionary measures promulgated by the CDC, and other health authorities, threatens the health of its inmates, especially including those like [Defendant], whose risks of complications from lung disease put them in grave danger for complications leading to death from COVID-19.

3

ECF No. 67, PgID 273-74.

Defendant asserts that, as of the date he filed the Motion, approximately 158 Michigan prisoners and 26 corrections officers have confirmed cases of COVID-19 (and at least one corrections officer and prisoner have died from it). He states that prisoner deaths are becoming reported, and the risks of death due to complications from COVID-19 only increases for those with asthma and COPD, like him. Defendant relies on a recent case from this district where the court determined that home confinement of the defendant and those similarly situated would benefit the public safety by helping to decrease the number of individuals in detention centers and correctional facilities. *See United States v. Rajesh Doshi*, Case No. 13-cr-20349 (Order Granting Defendant's Motion for a Judicial Recommendation to Home Confinement, issued March 31, 2020).

In *Doshi*, the defendant was 64 years old, suffered from diabetes and hypertension, and was convicted and sentenced for health care fraud conspiracy and health care fraud, for which he was sentenced to 84 months (7 years) in the custody of the Bureau of Prisons. The defendant had only served approximately half of that sentence, and based in part by the defendant's underlying conditions, the court recommended that the BOP place him in home confinement for the remainder of his sentence.

Defendant argues that he also should immediately be released to home confinement to both minimize his own risk of contracting COVID-19 and to benefit public safety. He asserts that, if at home, he would be able to follow the CDC

guidelines and decrease his chances of contracting the virus of suffering from complications and would help decrease the population density at SCJ, consistent with the ability of Michigan judges to release "vulnerable" inmates, including those with "chronic conditions." Finally, Defendant argues that he has a demonstrated history of complying with the conditions of a tether, such that he no risk of flight. For all of these reasons, Defendant concludes that the risks to his health outweigh any potential benefit, if any, to keeping him at SCJ.

The Government opposes Defendant's release from SCJ and transfer to home confinement for a number of reasons, and the Court agrees that several of them establish that Defendant's request must be denied. First, the Government argues that the Court does not have the power to grant Defendant the relief he seeks - a release from custody in favor of home confinement. Defendant was convicted and sentenced in Oakland County on a charge of assault by strangulation in 2017. Defendant is currently serving a sentence in state court for 5-20 years for assault by strangulation, with an earliest possible release date of September 2022.

In August 2019, the Government sought and received a writ of habeas corpus ad prosequendum to temporarily bring Defendant into federal custody to face the charges in his federal indictment. Defendant remains in temporary federal custody pursuant to his request, but that does not divest the State of Michigan of its custody over him. *See, e.g., Jones v. Hemingway*, No. 02-CV-701790DT, 2002 WL 1009719, at *2 (E.D. Mich. Apr. 30, 2002) ("Producing a state prisoner under a writ of habeas corpus ad prosequendam to answer federal criminal charges does not relinquish state

5

custody."). And, the State of Michigan – not the Government – retains primary custody over Defendant, as it was the first body to arrest him. *Homan v. Terris*, No. 11-CV-15574, 2014 WL 2779972, at *2 (E.D. Mich. June 19, 2014) ("[T]he state retains primary jurisdiction over the prisoner, and federal custody commences only when the state authorities relinquish the prisoner on satisfaction of the state obligation.") (quoting *United States v. Evans*, 159 F.3d 908, 912 (4th Cir. 1998)). Accordingly, this Court has no jurisdiction over Defendant's state offense, nor can it order the Michigan Department of Corrections to release Defendant in favor of home confinement. Even if the Court were to grant the Motion, Defendant would be returned to the custody of the State of Michigan.

Second, if the Court were to construe the Motion as one to review the order of detention (Defendant consented to detention and has not asked this Court to review that order), Defendant does not qualify for release from federal custody. Defendant is a twice convicted felon currently serving a state sentence for assault by strangulation, not only a felony but also a crime of violence. He allegedly committed the crimes with which he is now charged (stealing, possessing, and selling approximately 70 vehicles over several months in 2017) while on pretrial release (court supervision) on the strangulation charge – while wearing a tether.

The Court finds that Defendant's history and characteristics, the weight of the evidence of his dangerousness to the community, and the nature and circumstances of the instant charges establish, by clear and convincing evidence, that there are no conditions that could reasonably assure the safety of the community and Defendant's

custody."). And, the State of Michigan – not the Government – retains primary custody over Defendant, as it was the first body to arrest him. *Homan v. Terris*, No. 11-CV-15574, 2014 WL 2779972, at *2 (E.D. Mich. June 19, 2014) ("[T]he state retains primary jurisdiction over the prisoner, and federal custody commences only when the state authorities relinquish the prisoner on satisfaction of the state obligation.") (quoting *United States v. Evans*, 159 F.3d 908, 912 (4th Cir. 1998)). Accordingly, this Court has no jurisdiction over Defendant's state offense, nor can it order the Michigan Department of Corrections to release Defendant in favor of home confinement. Even if the Court were to grant the Motion, Defendant would be returned to the custody of the State of Michigan.

Second, if the Court were to construe the Motion as one to review the order of detention (Defendant consented to detention and has not asked this Court to review that order), Defendant does not qualify for release from federal custody. Defendant is a twice convicted felon currently serving a state sentence for assault by strangulation, not only a felony but also a crime of violence. He allegedly committed the crimes with which he is now charged (stealing, possessing, and selling approximately 70 vehicles over several months in 2017) while on pretrial release (court supervision) on the strangulation charge – while wearing a tether.

The Court finds that Defendant's history and characteristics, the weight of the evidence of his dangerousness to the community, and the nature and circumstances of the instant charges establish, by clear and convincing evidence, that there are no conditions that could reasonably assure the safety of the community and Defendant's

appearance at future proceedings. Defendant's actions also demonstrate that he cannot be trusted to comply with the terms of release or be effectively supervised, something that may be more challenging for Pretrial Services to monitor because of the COVID-19 pandemic.[2]

The Court now addresses the effect of COVID-19. In doing so, an "individualized assessment of the factors" applicable to the defendant is required, not a categorical release on broadly formulated criteria. *See United States v. Martin*, No. 19-cr-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (ECF # 209)(denying release pending appeal on COVID-19 grounds and holding that allegations of defendants medical conditions including high blood pressure, asthma, and diabetes "insufficient to rebut" government proffer that "correctional and medical staff . . . are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to COVID-19.").

Many other district courts also have recently considered arguments citing the COVID-19 epidemic as a basis for pre-trial release. *See, e.g., United States v. Woods,* 4:19-cr-20112 (E.D. Mich. March 28, 2020) (ECF # 258 at 9) ("the COVID-19 pandemic cannot be the sole basis for releasing a defendant from custody pending trial; the Court must still consider the Section 3142(g) factors."); *United States v.*

---

[2]The Court notes that Pretrial Services and the Probation Department are adequately supervising clients during this crisis, including through the use of new and innovative means of monitoring clients and their conditions. In the case of Defendant and, in particular, his past behavior while on pretrial release, however, the Court is concerned that their resources could unnecessarily be stretched to monitor Defendant and ensure the safety of the community. Defendant's arrests and interactions with law enforcement officers (even absent convictions) in 2004, 2007, 2010, 2012, 2014, and 2016 further support the Court's conclusion that releasing Defendant from detention in favor of home confinement is not warranted at this time.

*Isbell*, 1:10-cr-10002 (W.D. Tenn. March 20, 2020) (ECF # 31) (denying motion for pretrial release based on COVID-19 in part because the government described "various precautions" the facility had taken to prevent the spread of COVID-19); *United States v. Gileno*, 3:19-cr-00161 (D. Conn. March 19, 2020) (ECF # 28) (denying motion to amend sentence to allow for early release where defendant had not "shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic . . . or that the facility is specifically unable to adequately treat" him.). Significantly, the courts in *Martin*, *Isbell*, and *Gileno* considered and denied similar requests for release from defendants with serious health conditions, including asthma, high blood pressure, and diabetes; congestive heart failure, chronic obstructive pulmonary disease, a tumor on the spine, and a heart blockage. *Martin*, 19-cr-140-13 at 8; *Isbell*, 10-cr-10002 at 4; *Gileno*, 3:19-cr-00161 at 4.

The Court notes that the risk of contracting COVID-19 is "not the sole determinant of whether detention is appropriate." Citing *United States v. Jones*, Crim. No. 17-582, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (rejecting release requested by incarcerated pregnant detainee on grounds that she is "at increased risk of contracting COVID-19"). *see also United States v. Raia*, __ F.3d __, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) ("But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

In this case, it is undisputed that Defendant's claimed underlying health conditions (asthma, sinusitis, allergies, and COPD) place him at a higher risk of complications if he is infected with COVID-19,[3] and that persons incarcerated likely face a greater risk of COVID-19 transmission than persons not incarcerated. As COVID-19 has become widespread in Michigan, however, there is no guarantee that Defendant is immune from contracting COVID-19 simply because he is not in SCJ. As set forth in the State of Michigan update on April 9, 2020, Sanilac County had only 21 cases of COVID-19 (with 2 deaths), a much lower volume of outbreak than found in other parts of Michigan. *See* https://www.michigan.gov/coronavirus. Most significantly, according to the same update, the City of Detroit (where Defendant last resided) had 6,061 reported cases of COVID-19 (with 275 deaths) and Wayne County (excluding the City of Detroit) had an additional 4,032 cases (with 229 deaths). *Id.*

As to SCJ, Defendant does not establish that SCJ itself is a detention facility that places him at particular risk, nor does he indicate that he has advised SCJ officials about his underlying health conditions. The Government contends that SCJ has robust prevention measures in place to reduce the chance that the virus will enter the jail and is prepared to prevent further spread should an inmate test positive.[4] The Government

---

[3]The Court assumes Defendant has all of those health conditions, although Defendant did not submit any medical documentation with his Motion.

[4]According to Sheriff Lieutenant Ryan McConnachie, the Assistant Administrator for the Sanilac County Jail, the jail is taking the following steps to address the virus:

**New Detainees**. First, as to detainees entering the facility for first time, an increased screening procedure has been implemented, including a screening questionnaire and temperature check in the sally port garage before the detainee even enters the jail. If the answers to the questions or the temperature check raise a red flag, the detainee is sent to a local hospital or further evaluated by medical personnel at the jail. Even for those new detainees that show no symptoms, they are

9

cites SCJ's response to an attorney visitor to the jail who self-reported contact with a person with COVID-19 demonstrates the seriousness with which SCJ is taking this pandemic. *See* footnote 3, *supra*.

The Court also notes that, at this time, there are no known or report cases of COVID-19 at SCJ. If the Court were to release Defendant from federal custody, he likely would not be released from state custody due to the nature of the charge for which he was convicted. Then, it is possible that the MDOC would transfer Defendant from SCJ to another facility and that facility may be far less equipped to protect inmates from contracting COVID-19.

The Government has argued that the Court should consider, and the Court has considered, that, in the context of COVID-19, Defendant's demonstrated refusal to comply with governmental direction. Specifically, Defendant has repeated ordinance

---

quarantined for a few days to see if symptoms develop. Anyone with new symptoms is quarantined for 14 days. Moreover, the jail is accepting fewer new prisoners than it typically does.

**Visitation**. There are no visitations by anyone outside the jail, except by video conferencing. All social visits to the jail stopped approximately three weeks ago and all in-person attorney visits stopped approximately two weeks ago. Prior to stopping these attorney visits, one defense attorney who visited an inmate at the jail reported previous contact with a person who tested positive for COVID-19. The jail quarantined the inmate for 14 days, and the inmate has not shown symptoms or signs of the virus, nor has he tested positive. The attorney who visited the inmate likewise has not tested positive for COVID-19.

**Sanitation**. All prisoners have been given disinfectant spray bottles to have in their cells, along with rags. The spray bottles are filled daily. Moreover, jail trustees clean the jail multiple times each day with disinfectant wipes.

**Staff**. Only jail staff and medical personnel can now enter the jail. The staff is screened every day with temperature checks and questionnaires. Moreover, the facility has instructed the staff to self-report symptoms and to stay home if sick.

**Other issues**. The facility stopped all social programs for now. The jail is just 60% full at this point.

violations, criminal conduct, and failures to follow the conditions of his probation and pretrial release. In doing so, Defendant has shown that he does not believe that the law applies to him, a dangerous proposition in the fight against COVID-19, which currently requires collective action by all persons. As a person who allegedly engaged in a significant crime operation while tethered, the Court is no persuaded that Defendant can be counted on to follow mandated social distancing and sheltering in place orders, which would put members of the community at further risk. *See United States v. Bell*, No. 17-CR-20183, Dkt. # 436 (E.D.M.I. April 3, 2020) (quoting *United States v. Smoot*, No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020) ("A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.").

Finally, the Court notes that efforts to reduce pretrial inmate populations on COVID-19 grounds have centered on low-risk offenders, not persons like Defendant, who is charged with multiple felonies, has a history of violence, and has failed to comply with the terms of his release in the past, including committing the crimes charged in this case. As set forth above, the Court has concluded that there is clear and convincing evidence that there are no conditions that could reasonably assure the safety of the community and Defendant's appearance. Those reasons dictate continued detention, even after consideration of the effects of COVID-19.

For the reasons stated above, the Court denies Defendant's Emergency Motion for Immediate Transfer to Home Confinement.

**IV.  Conclusion**

Accordingly, and for the reasons stated above,

IT IS ORDERED that Defendant's Emergency Motion for Immediate Transfer to Home Confinement [ECF No. 67] is **DENIED**.

IT IS FURTHER ORDERED that Defendant's Motion for Expedited Treatment of the Emergency Motion [ECF No. 68] is **DENIED AS MOOT**.

IT IS ORDERED.

s/Denise Page Hood
United States District Judge

Dated: April 13, 2020