## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                    Case No. 19-20115

v.                               Hon. Denise Page Hood

ROMANE PORTER,

      Defendants.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL
## [ECF NO. 291]

### I.    INTRODUCTION

Now, before the Court is Defendant, Romane Porter's, Motion for a New Trial. [ECF No. 291]. The motion is fully briefed. See [ECF Nos. 309 and 311]. For the reasons stated herein, Porter's motion is DENIED.[1]

### II.    BACKGROUND

Porter was charged in a four-count superseding indictment with one count of conspiracy to transport stolen vehicles under 18 U.S.C. §§ 371, 2312, and three counts of transportation of stolen vehicles under 18 U.S.C. § 2312. [ECF No. 167].

---

[1] The Court received an unauthorized supplemental brief in support of Porter's Motion for New Trial on August 7, 2024. The Court will not acknowledge the new arguments presented in the new filing at this time.

The charges relate to Porter's participation in a conspiracy to steal vehicles from the Pontiac Silverdome (the "Silverdome") in 2017 and the delivery of those vehicles across state lines. Beginning on March 12, 2024, the Court held a jury trial on the charges alleged in the superseding indictment. The trial lasted approximately four weeks. On April 4, 2024, following about two days of deliberations, Porter was found guilty on all Counts alleged in the Superseding Indictment. [ECF No. 270].

Porter now requests a new trial pursuant to Federal Rule of Criminal Procedure 33 because:

1. The evidence presented was insufficient to support a guilty verdict.
2. Prior to and during trial, Milan FDC failed to provide him with psychiatric medications and hearing aids, forcing him to proceed through trial without them.
3. During trial, the United States Marshals restricted Porter's ability to properly prepare by limiting access to digital discovery, placing arbitrary restrictions on Porter's ability to access his discovery materials, and placing Porter in isolation without access to any of his materials for an entire weekend mid-trial.

[ECF No. 291, PageID.4474]. Porter argues that these errors prevented him from adequately preparing for trial and affected his ability to participate during trial, rendering his trial constitutionally unfair. *Id*.

The Government argues that the interests of justice do not support a new trial because the evidence supported the jury's verdict and no substantial legal error occurred. [ECF No. 309, PageID.4785].

2

## III.   LAW AND ANALYSIS

"[T]he Court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Proc. 33(a). When faced with a Rule 33 motion, the Court may weigh the evidence and assess the credibility of the witnesses; "[i]t has often been said that [the trial judge] sits as a thirteenth juror" when considering a Rule 33 motion. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). A motion for a new trial is premised on the argument that the jury's verdict was against the manifest weight of the evidence. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). Such motions are generally granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict. Id. at 592-93. In general, motions for a new trial are disfavored and should be granted with caution. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). The defendant bears the burden of proving that a new trial is warranted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994).

### A. Sufficiency of Evidence

Viewing the evidence as a "thirteenth juror," the Court finds that the jury's verdict was not against the manifest weight of the evidence presented at trial. Porter attempts to distance himself from the conspiracy by pointing to testimony by several witnesses who he alleges either did not know him, had never seen him, or that Porter

3

was "unsure or unclear of the – of what was really going on." [ECF No. 291, PageID.4482]. Nevertheless, the evidence presented by the Government sufficiently established that Porter was (1) involved in the conspiracy to steal cars from the Pontiac Silverdome and (2) caused several of those vehicles to be transported in interstate commerce.

Allen Klusek, a co-conspirator, testified that he was a part of the conspiracy to steal cars from the Silverdome parking lot. [ECF No. 260, PageID.2145]. He further testified that as a part of the conspiracy, it was his job to show unauthorized individuals where the cars were and letting them in and out. *Id*. Klusek testified that "Dan," another co-conspirator, told him that a friend of his would come take the cars. *Id*. at PageID.2144. Under the plan, Dan's friend would "come in and bring his people as to how many cars were to be taken." *Id*. at PageID.2146. When shown a picture of Porter, Klusek testified that he was the "friend" that Dan sent to retrieve the cars from the lot. *Id*. at PageID.2150.[2]

Klusek testified that he has health conditions that impact his memory, including a few cases of cancer, alzheimer's, and a history of strokes. *Id*. at PageID.2126. However, Klusek confirmed that he did not have the aforementioned ailments when he testified at the grand jury. *Id*. at PageID.2178. The Court finds that

---

[2] Porter stipulated that he was at the Pontiac Silverdome on various dates and times. Gov't Exhibit 44.

4

despite Klusek's current health status, he provided credible testimony of the events surrounding the charges against Porter.

Marneice Bond, the mother of two of Porter's children, testified that on at least three occasions, she drove Porter, his nephew, and two other gentlemen to the Silverdome. [ECF No. 266, PageID.2554-57]. She further identified Allen Klusek as the individual who let Porter and the other men onto the Silverdome parking lot. *Id.* at PageID.2557. Ms. Bond further testified that she saw Klusek "point[ing] at some cars." *Id.* at PageID.2556. Ms. Bond testified that the individuals that she drove to the Silverdome did not return to the car she was driving, instead, they "got into the cars and they left." *Id.* at PageID.2557. Ms. Bond's testimony confirms the scheme described by Klusek.

Relevant to Counts 2-4 of the Superseding Indictment are Vehicle Identification Numbers ("VIN") ending in 4835, 6799, and 3328. [ECF No. 167]. The documents show that the vehicle with a VIN ending in 4835 was sent to Bert Williams in Louisville, Kentucky in June of 2017. The address of origin was 572 Alger Street in Detroit, MI. Mr. Dockery testified that the first time that he picked up vehicles from Porter was from an address on Alger Street in Detroit. [ECF No. 282, PageID.3408]. Porter attempted to discount Mr. Dockery's retrieval of the vehicles from the Alger address by eliciting testimony that Mr. Dockery was never actually at the Alger address. *Id.* at PageID.3448. Yet, Mr. Dockery consistently

5

testified that the car hauler was too large to go down the residential street and he had to park on a larger side street near the address. *Id*. at PageID.3448-49. Porter stipulated to traveling back and forth from the Silverdome to the Alger Street address on several occasions. Gov't Exhibit 44; ECF No. 278, PageID.2886-87.

The vehicle with a VIN ending in 6799 was transported to Last Stop Auto in Radcliff, Kentucky in August of 2017. The location of origin was MHHB Transportation at 11311 Woodbine in Redford, MI. The Woodbine address is the same address that was used to obtain a business signature card from Huntington Bank. Gov't Exhibit 40; ECF No. 278, PageID.2844. Porter signed the Business signature card document as the President/Owner/CEO of MHHB Transportation LLC.

Michael Dockery is the owner of Dock's Transport, Inc. [ECF No. 267, PageID.2571]. Mr. Dockery testified that he did business with an individual who he knew as "Buck." *Id*. at PageID.2574. Mr. Dockery identified the individual named "Buck" as Porter. *Id*. at PageID.2574-75. Mr. Dockery testified that Porter told him that he was starting a car line and wanted Mr. Dockery to haul some cars for him, which Mr. Dockery agreed to do. *Id*. at PageID.2575. Mr. Dockery testified that he was directed to take the first load of vehicles between Kentucky and Indiana. *Id*. at PageID.2579. The Government provided bills of lading from Dock's Transport which documented the year, make, model, and VIN's associated with the vehicles to

be transported. Gov't Exhibit 29. The documents further provide the date of pick up, location of origin, and destination. *Id*.

Bert Williams was the owner of Last Stop Auto, an automobile dealership and mechanic shop in Radcliff, Kentucky near Louisville. [ECF No. 283, PageID.3615-17]. Mr. Williams testified that he met Porter through Gregory Bentham. *Id*. at PageID.3617. Mr. Williams further testified that Last Stop Auto was in need of inventory and Mr. Bentham thought Porter would be a "good ideal solution for [its] need." *Id*. at PageID.3618. Mr. Williams also testified that Porter went by the nickname "Buck." *Id*. at 3620. Porter sold Mr. Williams Volkswagen and Audi vehicles for $10,000 per car plus a $500 delivery fee. *Id*.  The delivery fee was to cover transport of the vehicles from Michigan to Kentucky. *Id*. at PageID.3621. In total, Mr. Williams testified that he bought 46 or 47 cars from Mr. Porter. *Id*. at PageID.3622. The vehicle with a VIN ending in 4835 is listed as one of the first vehicles to be sold to Mr. Williams. Gov't Exhibit 31.

Porter cross examined Mr. Williams as to the authenticity and accuracy of the sale documents he provided to the Government. [ECF No. 284, PageID.3732-34]. Mr. Williams testified that some of the information, including where money wires were sent, was inaccurate. *Id*. at PageID.3735. Yet, Mr. Williams remained steadfast in that fact that he purchased numerous Volkswagen and Audi vehicles from Porter, which were later reported stolen.

Oakland County Detective James McCoy testified that he was assigned to the Oakland County Sheriff's Office Auto Theft Unit from 2016-2022. [ECF No. 278, PageID.2814]. Detective McCoy was called to testify on several topics throughout the trial. Detective McCoy testified that he worked with the Federal Bureau of Investigation as a joint task force officer to recover the vehicles stolen from the Silverdome "due to the vehicles being transported out of state[.]" *Id*. at PageID.2816. The Government presented a video of Porter speaking with Detective McCoy and two other agents stating that he was involved in taking vehicles from the Silverdome parking lot. Gov't Exhibit 22.

Reid Albert was the head of security for Volkswagen. [ECF No. 278, PageID.2856]. Mr. Albert testified that he investigated the cars missing from the Silverdome and as part of the investigation, he reported several cars missing to law enforcement. *Id*. at PageID.2869. Mr. Albert further testified that he traveled to Kentucky to investigate a tip regarding the origin of several vehicles. *Id*. at PageID.2872. He further stated that Porter was identified by individuals he spoke with in Kentucky because his name was on the bill of lading for the vehicles in question. *Id*. at PageID.2873. Mr. Albert testified that Porter revealed to him that "he had removed – somehow engaged in removing cars from the Silverdome and had had them loaded in a private lot of some two or three miles from the Silverdome, and that's how they got shipped" to Kentucky. *Id*.

8

Porter points to the testimony of Theresa Channel of Pasha, Richard Patterson of Dock's Towing, and Yolinda Boatwright of Pasha to paint a picture that there was a lack of organization at the Silverdome; that these individuals did not know Porter or whether he was authorized to be at the Silverdome; and that the Silverdome lot was riddled with people coming in and out. [ECF No. 291, PageID.4480]. Nevertheless, the evidence makes clear that much of the lack of organization was caused by the conspiracy effectuated by Porter along with Daniel Onorati and Klusek to take cars from the Silverdome lot. Vehicles which were never made available for sale and which Porter was not authorized to take. The evidence further shows that Porter made several short trips to the Silverdome lot to effectuate the conspiracy. It also shows that Porter acquired the service of Dock's Transport to move the vehicles across state lines. For these reasons, the evidence is sufficient to support a finding of guilt on all counts. Porter's motion for new trial is DENIED as to this point.

## B. Sixth Amendment Violations.

Porter argues that the actions of the U.S. Marshals in denying him access to his materials, medication, and hearing aids during trial severely limited his ability to confront witnesses in violation of the Sixth Amendment. [ECF No. 291, PageID.4482]. The Sixth Amendment provides defendants the right to be confronted with the witnesses against him. "Indeed, [t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."

*Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006), as amended on denial of reh'g and reh'g en banc (Feb. 15, 2007) quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "Although the Confrontation Clause protects a defendant's right to cross-examine witnesses, this right is not absolute. Instead, the Constitution guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Matthews*, 31 F.4th 436, 452 (6th Cir. 2022). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Boggs v. Collins*, 226 F.3d 728, 737 (6th Cir. 2000)

### 1. Access to discovery.

Porter argues that the U.S. Marshals hampered his ability to prepare for trial and meaningfully conduct cross-examination of many of the government's witnesses. [ECF No. 291, PageID.4482]. Porter argues that the difficulty was because he was "frequently returned to Milan FCI with only an hour to eat and shower before detainee's were required to be in their cells for the night." *Id*. at PageID.4482-83. Porter further states that he was denied access to his digital discovery for arbitrary reasons. *Id*. Porter argues that such actions limited Porter's ability to challenge the testimony of the government's witnesses. *Id*. at PageID.4483.

10

Porter was arraigned on the first superseding indictment on June 17, 2022, almost two years before trial. [ECF No. 167]. As mentioned above, Porter was represented by counsel until April of 2023, when the Court determined that he demonstrated that he truly wanted to proceed *pro se*.[3] Mr. Henry Scharg stayed on as standby counsel throughout the entirety of the trial. Mr. Scharg represented that Porter had all of the discovery available in the case. [ECF No. 280, PageID.3180]. Mr. Scharg, with the assistance of Deputy Marshal Don Hughes facilitated the delivery of Porter's discovery materials. *Id*. Mr. Scharg further added that Porter was provided with binders of all the exhibits. *Id*. at PageID.3181. The documents had to be removed from the binders so that Porter could transport them to Milan, which occurred. *Id*. Therefore, Porter's complaints about being unable to access discovery in digital formatting is overcome by the presence of the physical copies provided to him.

The Government argues that "Porter has not identified any topic or issue critical to his defense that he was unable to explore on cross-examination." [ECF No. 309, PageID.4794]. The Court agrees. Porter had the opportunity to cross-examine every witness put forth by the Government and took advantage of every opportunity. In fact, in many instances, Porter was allowed to re-cross witnesses.

---

[3] Porter was appointed six Criminal Justice Act Attorneys prior to trial.

Porter argues that he was held in the special housing unit at Milan for an entire weekend without access to his discovery materials in the middle of trial, making him unable to prepare for the witnesses to be called. [ECF No. 291, PageID.4484]. The Court was made aware of this incident. Porter does not deny that he was provided a list of the witnesses to be called and the corresponding exhibits the Government planned to use. Porter also does not deny that he was given time to locate the materials prior to the start of trial on March 19. Porter argues that requiring him to search the laptop for necessary documents was insufficient preparation. *Id*. at PageID.4486]. However, Porter was aware of the exact information that would be used. He did not have to search the entire laptop.

Porter further argues that he missed a significant amount of time to prepare for that week's witnesses and "[t]hat weekend was the only time Mr. Porter had to prepare for one of the most important witnesses in his case[,]" Allen Klusek. *Id*. at PageID.4486. Porter knew Mr. Klusek would be testifying against him as early as March of 2022. Porter had at least two years to prepare for this witness. Porter does not state how the cross-examination of Klusek would have differed in light of a new trial and Porter constantly attacks the credibility of the witness who he believes to have been the most detrimental to his case. [ECF No. 311, PageID.4817]. Despite Porter's being housed in the special housing unit, he has not shown how he was prejudiced by that event. Porter agreed that he had seen the statements of the

witnesses prior to the day of their testimony. [ECF No. 281, PageID.3225-26]. This was not a situation where Porter was surprised.

### 2. Hearing aids and psychiatric medication.

On April 27, 2023, the Court held a competency hearing at the request of Porter's counsel at the time, Henry Scharg. [ECF No. 221]. In finding that Porter was competent to stand trial, the Court noted the report of psychiatrist, Dr. Ryan Nybo, the doctor who interviewed Porter. *Id*. at PageID.1776. Dr. Nybo concluded that Porter "demonstrated a sufficient ability to understand the nature and consequences of the court proceedings against him and a sufficient ability to assist counsel in his defense, should he so choose. *Id*. Dr. Nybo went on to report that "[f]rom the available information, there is no evidence to indicate the Defendant suffers from a mental disorder that would substantially impair his ability to understand the nature and consequences of the court proceedings brought against him or substantially impair his ability to assist counsel in his defense." *Id*. at PageID.1777.

Defense counsel objected to the findings of Dr. Nybo and the Court entertained argument as to the objection. See *Id*. at PageID.1777-1782. Mr. Scharg argued that "although he does not have a mental disease or defect [Porter] has a significant personality disorder in the form of mental disorder that is not necessarily

13

a mental disease or defect under 4241, but he is unable to assist properly in his defense." *Id*. at PageID.1778. The Court adopted the report of finding that Dr. Nybo had "taken into account – all of the interviews and whatever evaluations were made, outlines them extremely well, gives a diagnosis and prognosis…and then gives…a fairly detailed opinion on the issue of present competency to stand trial[.]" *Id*. at PageID.1783.

The Court further granted Porter's Motion to Disqualify Counsel (Henry Scharg) and approved his request to proceed in pro per for the balance of the case, with Mr. Scharg as stand-by counsel. [ECF No. 224, PageID.1873]. The Court reminded Porter that it could interpret his repeated requests for a new attorney as a demonstration that he wanted to proceed pro se. [ECF No. 221, PageID.1810]. Porter expressed that it was his desire to give up his right to be represented by counsel as long as he had standby counsel, which the Court appointed. *Id*. at PageID.1811.

It was at that time that Porter also alleged that the Marshals lost his hearing aids and Milan FDC would not give him new ones. *Id*. at PageID.1820. Porter requested to return to State custody to retrieve new hearing aids and to address his parole situation. *Id*. at PageID.1821.

On February 15, 2024, the Court held a status conference, and a final pretrial conference was scheduled for March 5, 2024, with a trial date set for March 12,

14

2024. On March 5, 2024, the final pretrial conference was held and continued until March 7, 2024, to allow the parties time to negotiate a plea deal. Unable to agree, the Government requested that the trial be adjourned to a later date. Porter objected to any extension and demanded that trial be held as scheduled. [ECF No. 299, PageID.4690]. At that time, Porter informed the Court that he did not have batteries for his hearing aids *Id*. at PageID.4689. Despite not having batteries for his hearing aids, Porter emphatically affirmed that he was ready to go to trial. *Id*.

> **THE COURT:** That doesn't have -- I just need to know if none of that occurs, you don't get hearing aid batteries and you don't get a room to look at the discovery, are you going to be ready on March 12?
>
> **DEFENDANT PORTER:** I'm ready to go to trial on March 12, Your Honor.

*Id*. at PageID.4690. The thirteen-day trial began as scheduled on March 12, 2024. See [ECF No. 277].

Porter admits that he did not inform the Court that he no longer had his hearing aids until the fourth day of trial. [ECF No. 291, PageID.4487]. Porter argues that he did not receive his hearing aids or batteries until April 3, when the trial was over. *Id*. However, Mr. Scharg informed the Court on March 15, 2024, "I told him that I would replace [the batteries], and he said no. [Porter] said, you know, I'll handle it myself." [ECF No. 280, PageID.3177]. Despite Porter's emphatic representation that he was ready to proceed to trial with or without his hearing aids, he had the opportunity to have functioning hearing aids, but failed to take it. Further, the Court must note that

15

this was not the first time Porter alleged that the Marshals lost his hearing aids prior to the scheduled trial date. Porter not only insisted on proceeding to trial with or without his hearing aids but delayed in raising the issue until day four of trial. Porter was in the best position to know the impact of not having his hearing aids and asked the Court to proceed anyway. A new trial is not warranted on these grounds.

Porter argues that he informed the Court that he was being denied psychiatric medications on March 20, 2024, day six of trial. [ECF No. 291, PageID.4487]. Porter argues that "these medications were for tinnitus, vertigo, depression, and PTSD." *Id*. at PageID.4488. Further, "[w]ithout these medications, Mr. Porter suffered from migraines, frequent ringing in his ears affecting his ability to hear, and mood changes…If Mr. Porter had been denied medication for a physical health condition, such as asthma or diabetes, it is unlikely that the Court would have proceeded with trial." *Id*.

Deputy Marshal Caleb Gundich stated that March 20, 2024, was "the first time I have heard of any psychiatric medications for Mr. Porter." [ECF No. 282, PageID.3383]. Marshal Gundich further stated that in his experience with other inmates coming from Milan, like Porter, that "if they have medication it will travel with them if they are supposed to be taking [it]. I have never had any medication for Mr. Porter in the lockup." *Id*. at PageID.3383-84. The Court requested that an inquiry be made with the Marshals regarding whether Porter should have medication. *Id*. at

16

PageID.3384. The Court asked Porter if he had been "laboring under the inability to work for the past few days we've been in trial because of these psych meds." *Id*. at PageID.3385. Porter asserted that the medications had been an issue since 2019. *Id*. Yet, Porter conceded that he had not brought them up since the start of trial. *Id*.

Despite the lack of hearing aids and psychiatric medications, Porter continued to cross examine witness, make credible objections, and maintain his theory of the case.  Neither the hearing aids nor the psychiatric medications, which Porter could not provide any documentation for, warrant the granting of a new trial. Porter's motion for new trial is DENIED.

## IV.   ORDER

In light of the foregoing,

IT IS SO ORDERED that Defendant's Motion for New Trial [ECF No. 291] is DENIED.

IT IS FURTHER ORDERED that this matter will proceed to sentencing as scheduled.

SO ORDERED.

s/Denise Page Hood_____
Denise Page Hood
United States District Judge

Dated: August 30, 2024